## McArthur Brothers Co. v. William A. Troutt.

1. MASTER AND SERVANT—*Performing Acts Known to be Dangerous by Direction of the Master.*—A servant, who, without objection, performs an act in obedience to the directions of his master, but which he knows to be dangerous, is not in the exercise of ordinary care for his personal safety, and can not recover for injuries received by him in the performance of such act.

Action in Case, for personal injuries. The Hon. JOSEPH P. ROBARTS, Judge, presiding. Heard in this court at the August term, 1899. Reversed, with a finding of facts. Opinion filed March 16, 1900.

**Statement.**—This was a suit to recover damages for an injury resulting in the amputation of both legs. Verdict and judgment for appellee for $20,000.

The first count of the declaration alleges negligence as follows:

" And plaintiff avers that he was a brakeman on one of the said trains in the employ of defendant, and on the date aforesaid was at his proper place on defendant's train as such brakeman, and defendant carelessly and negligently ordered and commanded him to get off of said train while it was in motion."

Then follows an averment that in getting off, in obedience to said order, and while using ordinary care for his personal safety, he fell and both his legs were run over. The second count is similar, except that the allegation of negligence is worded as follows:

" Plaintiff avers that he was, on the date aforesaid, in the employ of defendant, as brakeman on defendant's said train, and while he was so employed in the line of his duty as such employe on said train, said Frank McNeal, then and there present, and exercising his authority as superintendent or foreman of said work, then and there negligently ordered and commanded plaintiff to get off of said train, while it was loaded with dirt and in motion."

Defendant pleaded not guilty.

McArthur Bros., appellants, were contractors with the I. C. R. R. Co., engaged in filling up with dirt, trestle work about a mile and a half in length. The dirt used was secured about a mile and a half east of Murphysboro, and was loaded into trains of flat dump-cars, drawn by an ordinary locomotive, which cars were run onto the trestle and the dirt dumped therefrom. These trains were operated by two men to each train, one on the engine, who acted as engineer and fireman, and one on the cars, who acted as brakeman, and to some extent as conductor. The custom was to back the trains when loaded, to the point where the filling was in progress. Nineteen cars were in a train. The trestle varied in height, reaching some sixteen feet at the Murphysboro terminus. In backing the train the conductor or brakeman, whichever he may be called, riding on

the back car, would signal the engineer when and where to stop. The work was being done under the supervision of Frank McNeal, superintendent for appellants, who, as such, employed and discharged all the hands engaged thereon and had general supervision of all the different departments of the work. Appellee was injured on September 23, 1898. He had applied for work to McNeal as a train hand, stating his experience as a railroad man, and was first given work as a member of a dump gang, and later, about three weeks before the accident, given charge of one of the dirt trains. He was forty years of age, and had railroaded for fifteen years, having worked as a brakeman, switchman and fireman on a number of different railroads. Appellee and McNeal were the only persons present when the conversation immediately preceding the accident took place, and their statements of what was said and of what occurred differ but little.

The track extended in Murphysboro to a point near Cherry street, and at the time of the accident the trestle was filled up to Evelyn street, one block east of Cherry. McNeal lived about a block west of Cherry, and was going home to his dinner at the time in question. Evelyn street is crossed by an iron bridge sixteen feet high, which was the height of the grade of the track just east of Evelyn street; the width of the grade at the top was twenty feet. The west end of the track was at such a distance from Evelyn street as to only allow some sixteen cars to stand between Evelyn and Cherry streets, thus requiring the engine and one or two cars to stand east of Evelyn street when the train came to a stop.

On the day of the accident, after the cars were loaded with dirt, McNeal got on the end, or hind car, when the train started from where it was being loaded, and sat down on the dirt, a little ahead of appellee. When McNeal got on the train, as appellee testifies, he "asked me if I was going to stay there for dinner, or was going down to the dump, and I believe I told him I would go down to the dump, and let the other fellows go, so as to give the steam

McArthur Brothers Co. v. Troutt.

shovel water, and he said 'All right, I will go over with you.' "

As the two men approached Evelyn street, according to McNeal's testimony, he said to appellee, " Where is your dinner ? " Appellee answered, " On the engine." McNeal then said, " Very well; you can get off and I will ride the train over, as I am going to dinner."

Appellee's version of what McNeal said is: " Well, you jump off here and get your lunch. and stop the engine here at the pier, and I will ride over and get my dinner." Thereupon, without objection, appellee stepped to the side of the car, and placing his foot on the top of the side-board, started to jump from the car while it was in motion, when his foot slipped and he fell forward out of the car, and striking the ground, so rolled as to bring both legs over the rail, in which position they were crushed by the cars. The train at the time was running from four to six miles an hour. Appellee had jumped from these same cars, in this same way, prior to the time in question. As a railroad brakeman he had been accustomed for years to jump from moving trains, and was familiar with the dangers incident thereto. McNeal, so far as the evidence shows, had no experience as a train hand, and was six years the junior of appellee, being thirty-four years of age.

PERCY WERNER, attorney for appellant; H. W. MAGEE and JOHN M. HERBERT, of counsel.

WILLIAM A. SCHWARTZ, attorney for appellee; R. J. McELVAIN, of counsel.

MR. JUSTICE WORTHINGTON delivered the opinion of the court.

McNeal and appellee are the only witnesses to the conversation immediately before appellee jumped from the car. At the close of appellee's testimony, and again after all the testimony, appellant moved the court to instruct the jury to find the defendant not guilty. This the court refused, and the refusal is assigned as error.

In considering the assignment of error it must be decided upon the version of the conversation as given by appellee, since the conclusion of the jury, listening to both McNeal and appellee, as to which stated the conversation correctly, is binding upon this court.

The contention of appellant is, that the direction of Mc-Neal "to jump off," was not such an order as brings this case in line with the decisions of the Supreme Court, where judgments have been sustained for injuries to employes received in consequence of obeying the commands of their employers; and that appellee, being an experienced railroad man, was fully cognizant of the danger that he risked in jumping, and assumed it; and therefore can not recover.

That appellee was an experienced railroad employe is shown by his own evidence. He testifies, in cross-examination, that "it has been fifteen years since I commenced railroading, and I have had ten years continuous service. I have worked as brakeman, switchman and firing an engine." He further testifies:

"I had often jumped from moving trains before in my ten years' experience as a brakeman. * * * The three weeks that I was working on this dirt train, I had frequently jumped off the train while it was in motion, and I jumped off just the same way I jumped off this time, except when the train stopped. * * * I was on the top of the car, and I just got up and jumped off, that is all. I knew I was jumping off. I was not very slow; we were getting close to the trestle. I made no objection to getting off. I did it because I was ordered. Of course I had no such idea of getting hurt, and I do not suppose he had either. I did not hesitate; I went there as usual and put my foot up on the top and undertook to leap over, and my foot slipped when I tried to jump. Of course all we people take chances. * * * Of course I supposed I could get off all right. There is always danger in jumping off a moving train; more danger in some than in others. * * * When I stood upright on the highest point of this car, my feet were six feet three inches over the top of the rail, so I undertook to jump down off that car six feet and three inches. The car was not running over six miles an hour. I just jumped straight out from the side of the car. I did not have time to jump with the train. * * * I jumped off there be-

fore. * * * I had no time to stand and parley about the best way to jump off. I did not stop at all; I just raised up and jumped. * * * According to the construction of the cars, I knew getting on and off was dangerous. I knew that all right."

Upon re-direct examination, appellee testifies:

"On the cars in question there were no hand rails, and nothing to jump off from; nothing to hold to. I had gotten off these cars before when I got a signal to stop, of course. McNeal told me that he wanted to give some of that dirt to the teams on the Cherry street crossing, and he wanted the engine stopped at the pier on the east side of Evelyn street. If I had jumped off on my own accord I guess I would have been taking chances; but I think it was them taking the chances when they told me to get off at that place on the track. McNeal did not make any objections to my getting off that way. He did not tell me what way to get off."

These extracts from the testimony of appellee, as given in the abstract, make it clear that he knew the situation, and the danger of jumping from such a train when in motion. It is not the case of an order given by an employer who knows, or is presumed to know, the danger of its obeyance, to an employe who does not know it, or who may be presumed not to know it, as well as his employer. So far as the evidence discloses, appellee comprehended the danger of jumping from the car fully as well as McNeal, if not better. He was an older man, with years of practical experience in railroading. Nor is it the case of an order coupled with a threat of discharge if not promptly obeyed, or coupled with words from which such threat might be inferred. In this respect it differs from the cases relied upon by appellee.

In C. & A. R. R. Co. v. May, 108 Ill. 294, it does not appear that the deceased knew of the risk, while the opinion states that after the attention of the superintendent was called to the danger of the lumber falling, he said: "Let the lumber go to the devil," and "repeated his order with emphasis."

In Con. Coal Co. v. Wombacher, 134 Ill. 65, it is said:

"Ritzheimer (the superintendent) is to be assumed to have known of the danger of the roof, and his negligence in failing to communicate it to appellee is the negligence of appellant."

In this case it appeared that the superintendent had knowledge of the dangerous condition of the roof of the mine, and that the plaintiff had not, and was not apprised of the danger.

In Fanter v. Clark, 15 Ill. App. 473, the person injured was a boy fourteen years of age. He attempted to obey the order (to take out a sliver while a planing machine was in operation), when first given, but failed, and told his superior who gave the order that he could not do it, when he was again peremptorily ordered to do it. In passing upon the case the court says:

"First, that under the circumstances, in view of the plaintiff's age, and the positive order of the feeder to remove the obstruction, no want of ordinary care is imputable to the plaintiff; second, that the feeder was guilty of gross negligence."

In W., St. L. & P. Ry. Co. v. Hawk, 121 Ill. 263, it does not appear that Hawk, the plaintiff, was cognizant of the danger when he obeyed the order. Other cases, not cited by appellee, in which a recovery is sustained, throw light upon the character of orders that make the employer responsible for injuries sustained in obeying them.

In Ill. Steel Co. v. Schymanowski, 162 Ill. 447, there is no evidence that the plaintiff knew of the liability of the ore to fall. He had not been engaged with the working force in the day time in blasting the pile, and when, working at night in loading what had fallen, he asked for more light, he was ordered by the superintendent, with an oath and an abusive epithet, to go to work. In this case it is said:

"The servant is not chargeable with contributing negligence if he knows that defects exist, but does not know, or can not know, by the exercise of ordinary prudence, that risks exist."

And again:

"When the master orders the servant to perform his

work, the latter has a right to assume that the former, with his superior knowledge of the facts, would not expose him to unnecessary perils. The servant has a right to rest upon the assurance that there is no danger, which is implied by such an order. The master and servant are not altogether upon a footing of equality. The primary duty of the latter is obedience, and he can not be charged with negligence in obeying an order of the master, unless he acts recklessly in so doing."

In the case at bar there can be no presumption that the master's knowledge of the risk was greater than that of appellee, nor that appellee was in any manner ignorant of the risk.

In Con. Coal Co. v. Haenni, 146 Ill. 625, where a blacksmith in the employ of the company was called from his work to help raise a smokestack, which, falling, injured him, the court say:

" The material question which was and should have been presented to the jury, was, whether the plaintiff, under all the circumstances, had sufficient experience or knowledge to understand the hazard of the extra work which he was required to perform."

If this was a material question in the case cited, it is a material question in the case at bar, the answer to which is given by appellee's testimony, showing that he did have both knowledge and experience.

In Morris et al. v. Pfeffer, 77 Ill. App. 517, in which a judgment for plaintiff was sustained by this court, the evidence showed that while plaintiff expressed doubts as to the safety of the board he was directed to use, that, in reply, he was told to " go ahead * * * and hurry up, if you know what is good for you, and want to keep your job."

We are aware of no decision or text writer holding that a recovery can be had for personal injuries, when the party injured fully comprehends the danger of obeying an order, and yet obeys it without protest or hesitation.

Assuming the direction of McNeal to have been given, and to have been followed, as appellee testifies, with his acknowledged familiarity with railroading and the danger of jumping from cars in motion, the testimony of appellee shows want of reasonable and ordinary care on his part,

not excused by the character and circumstances of the order.

Jumping from the car may have been as safe as any other way of leaving it, at the speed at which it was running. But evidence to this effect does not tend to prove that jumping from the cars was reasonably safe, and the testimony of appellee shows that he knew that jumping from a car in motion was dangerous. It is apparent that the sympathy of the jurors for appellee, in his hopelessly crippled condition, must have warped their judgment. The instruction to find for defendant should have been given. Roberts v. C. & G. T. Ry. Co., 78 Ill. App. 528; Groszewski v. Chi. Sug. R. Co., 84 Ill. App. 586.

The remarks of the trial judge, in refusing to instruct the jury to find for defendant, have no proper place in the bill of exceptions. If the judge thought that such an instruction should have been given, or that a new trial should be granted, he should have so acted. More out of place still, are the criticisms upon the remarks of the court found in appellee's brief. The remarks were not made in the presence of the jury, and did not injure appellant. The respect that is due to judges in passing upon contested issues of law, is fully recognized by this court, and counsel who in their briefs fail to show due respect, take nothing by such action.

For the reasons assigned, the judgment of the Circuit Court must be reversed.

**Finding of Facts.**—We find that appellee was not in the exercise of ordinary care at the time of the injury, and was not excused from the exercise of such care by appellant or its agent, McNeal.